# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Musalleh Waheed Muhammad (10),<br><br>Defendant. | Case No. 19-cr-0168 (MJD/HB)<br><br>**REPORT AND RECOMMENDATION** |

HILDY BOWBEER, United States Magistrate Judge

This case is before the undersigned United States Magistrate Judge on Defendant Musalleh Waheed Muhammad's Motion to Suppress Evidence [Doc. No. 88] and Amended Motion to Suppress Evidence [Doc. No. 89].[1]  Muhammad moves to suppress evidence seized from his vehicle during a traffic stop on March 2, 2019.  He contends there was no reasonable suspicion or probable cause for the stop and that the state trooper unnecessarily prolonged and expanded the scope of the stop.  (Def.'s Mem. Supp. Mot. Suppress at 21 [Doc. No. 209].)  The case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.  For the reasons set forth below, the Court recommends that the motions be denied.

---

[1] The amended motion differs from the original motion in that a paragraph containing legal authority was added to page 4.

I.  **Background**

Defendant Musalleh Waheed Muhammad and nine co-defendants were charged on June 20, 2019, with Conspiracy to Distribute Methamphetamine and Cocaine, in violation of 21 U.S.C. §§ 841 and 846. (Indictment at 1–2 [Doc. No. 20].) Muhammad filed his motion to suppress evidence on July 22, 2019, and his amended motion to suppress evidence on July 29, 2019. The Court held a hearing on Muhammad's motions, as well as motions filed by two co-defendants, on August 21, 2019. The hearing on Muhammad's motions was continued to September 11, 2019. Muhammad filed a post-hearing memorandum of law in support of the motions on October 28, 2019, and the Government filed a post-hearing memorandum in opposition to the motions on November 27, 2019. The Court took the motions under advisement on November 27, 2019.

II.  **Relevant Facts**

New Brighton Police Officer Theodore Layton is a narcotics investigator assigned to the Ramsey County Violent Crime Enforcement Team ("VCET"). (Mot. Hr'g Tr., Aug. 21, 2019 ("TR1") at 3–4 [Doc. No. 172].)[2] He and other VCET officers were investigating a suspected narcotics trafficking operation, in which Roberto Lee, one of the co-defendants in this case, was a main target. (TR1 at 5–6.) The VCET had already seized drugs they believed were connected to Lee. (TR1 at 6.)

---

[2] The Court held two hearings on Muhammad's motion to suppress. The transcript of the hearing on August 21, 2019 [Doc. No. 172], will be cited as "TR1." The transcript of the hearing on September 11, 2019 [Doc. No. 194], will be cited as "TR2."

On the morning of March 2, 2019, Officer Layton learned from a GPS tracking device installed on Lee's GMC Acadia that Lee was driving toward a suspected stash house in Otsego, Minnesota. (TR1 at 5.) Officer Layton believed Lee intended to retrieve narcotics from the stash house, so he decided to commence surveillance of Lee and requested assistance from the VCET. (TR1 at 4–5, 56.) Officer Layton first observed Lee and Juston Lavalle, another co-defendant, at a car wash. (TR1 at 6–7.) Officer Layton was driving an unmarked pickup truck, and Lee was driving the Acadia. (TR1 at 5, 28.) Officer Layton followed the Acadia from the car wash to Lee's home in Maple Grove, Minnesota. (TR1 at 5.) Officer Layton saw Lee and Lavalle exit the Acadia, enter and exit the house, and re-enter the Acadia. (TR1 at 7–8.) Lavalle was carrying a dark-colored backpack that he did not have before. (TR1 at 8.)

Lee and Lavalle drove from Lee's house to a CVS parking lot adjacent to a business complex, where Lee drove around the perimeter of the parking lot. (TR1 at 8–9.) Officer Layton also drove around the perimeter in the opposite direction. (TR1 at 9.) When the cars passed each other, Officer Layton saw Lee in the driver's seat, Lavalle in the front passenger seat, and an unidentified male sitting on the passenger side of the middle row. (TR1 at 10, 33.) Officer Layton had not seen the other man get into the Acadia, but he had not been able to see the Acadia at all times due to heavy traffic and mounds of snow in the parking lot. (TR1 at 34, 55.)

Other surveilling officers were also driving around the business complex and providing updates to Officer Layton. (TR1 at 11.) Officer Garland told Officer Layton that he saw a man exit the Acadia, enter a Toyota Camry, and place something in the

backseat of the Camry. (TR1 at 11, 35.) The Camry then left the business complex. (TR1 at 12.) Officer Layton followed the Camry because he believed that a narcotics transaction had just occurred, specifically that the backpack contained narcotics and that the backpack had been transferred from the Acadia to the backseat of the Camry. (TR1 at 13.) Also, neither Officer Layton nor any other officer had seen Lee or Lavalle go into the CVS. (TR1 at 57.)

Officer Layton stopped next to the Camry at a stoplight and looked through the Camry's rear passenger window. (TR1 at 14.) He saw a dark-colored backpack on the floor of the rear passenger side. (TR1 at 14.) The backpack looked similar to the one he had seen Lavalle carry out of Lee's house earlier that day. (TR1 at 14.) After the light changed, Officer Layton followed the Camry onto Highway 494. (TR1 at 15.)

When officers first starting surveilling Lee on the morning of March 2, they notified Minnesota State Trooper Shaun Leshovsky that they might need assistance to conduct a traffic stop or apprehend a suspect. (TR1 at 15–16, 43.) After Officer Layton observed the suspected narcotics transaction in the CVS parking lot, he contacted Trooper Leshovsky, identified the Camry as the suspect vehicle, and asked Trooper Leshovsky to conduct a traffic stop, based if possible on an independent finding of probable cause. (TR1 at 16.) Establishing independent probable cause for a stop is standard procedure. (TR1 at 65.) If Trooper Leshovsky could not develop his own basis to stop and search the Camry, Officer Layton believed the information from his investigation would have sufficed. (TR1 at 17.) Trooper Leshovsky knew that the Camry was involved in a suspected narcotics transaction (TR1 at 86), and he had a

4

description of the vehicle and the license plate information. (TR1 at 90.)

As the Camry drove on Highway 494,[3] Trooper Leshovsky, Officer Layton, Officer Garland, and two other squad cars were in the vicinity. (TR1 at 46.) All of the officers maintained an open dialogue via radio transmissions. (TR1 at 48.) Officer Garland was the closest to the Camry and informed the others that it made two lane changes without signaling. (TR1 at 50; Gov't Ex. 1 at 11:09.) The video and audio recordings from Trooper Leshovsky's squad car camera and microphone indicate that he had just entered the highway at that point and was not yet close enough to the Camry to see it. (Gov't Ex. 1 at 11:09.)

Trooper Leshovsky testified at the motion hearing, however, that he subsequently saw the Camry abruptly cross two lanes of traffic to exit on Boone Avenue. (TR1 at 65.) Trooper Leshovsky acknowledged that the Camry cannot be seen on the video recording from his squad car camera at that point (TR1 at 91; Gov't Ex. 1 at 11:10), but it is likely, as Trooper Leshovsky further testified, that his viewpoint was more expansive than that of the dashboard-mounted camera. (Mot. Hr'g Tr., Sept. 11, 2019 ("TR2") at 11–12 [Doc. No. 194].) Thus, although the lane changes were not captured by the squad car video camera, there is no evidence that contravenes Trooper Leshovsky's testimony that he saw the Camry make an unsafe change of course as it approached and then took the Boone Avenue exit (TR1 at 65).

Trooper Leshovsky testified that he followed the Camry onto the Boone Avenue

---

[3] The testimony indicates that the pursuit occurred on both Highway 494 and Highway 694. (*E.g.,* TR1 at 46, 85.)

exit ramp and saw an expired temporary registration permit displayed in the rear window, as well as an obstructed license plate with snow covering the registration stickers, both of which are equipment violations. (TR1 at 66.) Trooper Leshovsky stopped at the red light at the end of the exit ramp, slightly behind and to the left of the Camry, giving him a view of the license plate and temporary registration permit. (Gov't Ex. 1 at 11:10.) His testimony about the obstructed license plate registration stickers is corroborated by the footage from his squad car video camera. (Gov't Ex. 1 at 11:10.) The month inscribed on the temporary registration permit is not visible on the squad car camera footage because that corner of the permit is partly folded down, but that does not establish that Trooper Leshovsky could not have seen the month from a different vantagepoint or in different lighting.

At that point, Trooper Leshovsky believed that he had three bases to stop the Camry: an unsafe change of course, the obstructed registration stickers on the license plate, and the expired temporary registration permit. (*See* TR1 at 66.) He activated his squad car lights, and the driver pulled over. (TR2 at 17–18.) Trooper Leshovsky exited his vehicle, approached the Camry, and asked the driver to move forward two car lengths so that the trooper could move his squad car out of the lane of traffic entering a Home Depot parking lot. (TR1 at 66–67.) The driver drove further than two car lengths, and Trooper Leshovsky yelled "stop" several times. (TR1 at 67.) The driver complied, and Trooper Leshovsky got back into his squad car and moved it forward. (TR1 at 67.)

Trooper Leshovsky approached the Camry a second time and could smell a faint odor of marijuana emanating from the driver's open window. (TR1 at 68; TR2 at 33.)

He recognized the odor from training and experience.  (TR1 at 68.)  He did not mention the odor at that time because he did not want the driver to feel coerced if he later asked for consent to search the car.  (TR2 at 71.)  Trooper Leshovsky identified the driver as Muhammad and the passenger as Edward G. Robinson, Jr.  (TR1 at 68.)

Trooper Leshovsky asked Muhammad to exit the vehicle so that he could show him the expired temporary registration permit in the rear window and to conduct the remaining business of the stop in his squad car.  (TR1 at 69.)  Muhammad asked Trooper Leshovsky if he wanted to pat-search him for weapons, and the trooper did so.  (TR1 at 69.)  Muhammad said he was borrowing the car from his sister and was in the process of buying it.  (TR1 at 69–70.)  Trooper Leshovsky verified that the registered owner of the car was Bernie Rose.  (TR1 at 70.)  Trooper Leshovsky and Muhammad sat in the front seat of the squad car while the trooper checked the validity of Muhammad's driver's license, the license plate, and the vehicle identification number ("VIN").  (TR1 at 70–71.)

Trooper Leshovsky approached the Camry a third time and attempted to locate the VIN on the interior of the car by looking through the front windshield, but he could not see it due to the alignment between the windshield and the VIN label.  (TR1 at 71.)  Trooper Leshovsky suggested that the windshield could have been a replacement windshield, "so the little window doesn't match up with the tint and it partially obstructs the entire VIN number."  (TR2 at 41.)  Thus, he opened the driver's side door so that he could look for the VIN on the B-pillar, which is the fixed pillar next to the steering wheel.  (TR1 at 71.)  Trooper Leshovsky again smelled marijuana when he was looking at the VIN in the car, and he engaged in casual conversation with Robinson about the trip

7

and his job.  (TR1 at 72.)  Trooper Leshovsky asked Robinson if he smoked marijuana, and Robinson said no.  (TR1 at 72.)

Trooper Leshovsky returned to his squad car, told Muhammad he had smelled marijuana, and asked Muhammad if he smoked marijuana.  (TR1 at 73.)  He testified that Muhammad's body language and demeanor changed, and he became "shifty" and increasingly nervous.  (TR1 at 73.)  Muhammad answered no and assured Trooper Leshovsky no marijuana was in the car.  (TR1 at 73.)

Trooper Leshovsky gave Muhammad a warning for the traffic and equipment violations and returned his driver's license and insurance card.  (TR1 at 74.)  Trooper Leshovsky then asked Muhammad if he would consent to additional questioning.  (TR1 at 74.)  Muhammad agreed, and Trooper Leshovsky asked if there was anything illegal in the car.  (TR1 at 74–75.)  Muhammad laughed nervously, and his overall nervousness increased.  (TR1 at 75.)  Trooper Leshovsky asked if he could search the car, and Muhammad denied consent.  (TR1 at 75.)  Trooper Leshovsky then told Muhammad that he had probable cause to search the vehicle based on the odor of marijuana and that he intended to search the vehicle.  (TR1 at 75.)  Trooper Leshovsky removed Robinson from the Camry so that he could search it.  (TR1 at 75.)

Trooper Leshovsky started systematically searching inside the car, and he observed marijuana debris in plain view near the center console.  (TR1 at 75.)  Trooper Leshovsky told Muhammad what he saw, and Muhammad said it probably belonged to his sister.  (TR1 at 76.)  Trooper Leshovsky then searched the rest of the car, including the glove compartment, where he found a plastic container with a leafy green substance

8

that smelled like marijuana. (TR1 at 76.) Muhammad then said marijuana was also located behind the driver's seat. (TR1 at 77.) Trooper Leshovsky believed this was a diversion tactic and that Muhammad was trying to direct him away from something else in the car that he did not want the trooper to find. (TR1 at 77.) When Trooper Leshovsky searched the back passenger side of the Camry, he found a blue backpack on the floorboard. (TR1 at 77–78.) He looked inside the backpack and found a large quantity of narcotics. (TR1 at 78.) At that point, Trooper Leshovsky arrested Muhammad and Robinson. (TR1 at 78.) Additional searching revealed a jar containing about 13 grams of marijuana behind the driver's seat. (TR1 at 78.)[4]

## III. Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. Searches conducted "without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). An exception to the warrant requirement is available for lawful traffic stops: "a police officer who has lawfully made a roadside stop of a vehicle may search the passenger compartment and trunk of that vehicle if probable cause exists to believe that contraband or evidence of criminal activity is located inside the vehicle." *United States v. Walker*, 840 F.3d 477, 483 (8th Cir. 2016). "Probable cause for a search under the automobile exception exists if the facts and circumstances known to the officers when they began the search were

---

[4] Trooper Leshovsky testified at the second motion hearing that the jar contained about 18 grams of marijuana. (TR2 at 61.)

sufficient in themselves for a person of reasonable caution to believe that contraband or evidence of criminal activity was present in the vehicle." *Id.*

### A. Probable Cause for the Traffic Stop

Muhammad first contends there was no reasonable suspicion or probable cause for the stop of the Camry. "Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994). If probable cause exists for the stop, "any additional underlying intent or motivation does not invalidate the stop." *Id.* (cleaned up).

The Court finds there were at least two, and possibly three, bases for probable cause to stop the Camry. First, the uncontroverted evidence is that the registration stickers on the rear license plate of the Camry were not visible. Minnesota Statute § 169.79, subd. 8(a) provides:

> Plate registration stickers. As viewed facing the plates:
>
> (a) License plates issued to vehicles registered under section 168.017 must display the month of expiration in the lower left corner of each plate and the year of expiration in the lower right corner of each plate.

According to the squad car footage taken when the Camry was stopped, the rear license plate did not display the month or the year in the corners of the plate, "[a]s viewed facing the plate[]." Although Defendant's Exhibit 4 shows the rear license plate with the snow cleared, and thus displays the month and year stickers, that photograph was obviously taken after the Camry was searched, as evidenced by the open trunk. Clearly, either someone brushed away the snow before they opened the trunk or the snow slid off the license plate when the trunk was opened and raised. But before Trooper Leshovsky

10

pulled the Camry over, it is undisputed that the registration stickers were completely covered with snow.  The Court concludes that Trooper Leshovsky had probable cause to stop the Camry based on the unviewable license plate stickers.

Second, the Court finds that Muhammad changed lanes unsafely and/or changed lanes without signaling at least once and possibly twice.  Officer Garland told Trooper Leshovsky via radio transmission that he saw the Camry cross two lanes of traffic without signaling.  Changing lanes without signaling provides probable cause for a traffic stop.  *Cartier v. George*, No. 08-cv-1323 (PJS/JJG), 2010 WL 561241, at *3 (D. Minn. Feb. 10, 2010); *United States v. Arguello*, No. 08-cr-139 (JMR/SRN), 2008 WL 3925107, at *4 (D. Minn. Aug. 20, 2008).  Although Trooper Leshovsky did not personally witness that violation, probable cause to stop a vehicle "may be based on the collective knowledge of all law enforcement officers involved in the investigation and need not be based solely upon information within knowledge of the officer(s) on the scene if there is some degree of communication."  *United States v. Rowe*, 878 F.3d 623, 628 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 1602 (2018).  Here, Officer Garland told Trooper Leshovsky that he saw the Camry change lanes without signaling.  That alone would have provided probable cause for a traffic stop.  In addition, Trooper Leshovsky testified that he also saw an unsafe lane change before the Camry exited onto Boone Avenue.

Third, the uncontroverted evidence demonstrates that the temporary registration permit displayed in the rear window of the Camry was expired.  If Trooper Leshovsky saw that the permit was expired before he stopped the Camry, that provided another basis for probable cause to stop the car.  *See United States v. Cloud*, No. 06-cr-316(JRT/RLE),

11

2007 WL 128939, at *11 (D. Minn. Jan. 16, 2007), *aff'd*, 594 F.3d 1042 (8th Cir. 2010). If he could not see the month noted on the permit, as suggested by the squad car camera video footage, the Court questions whether this would have provided a basis for probable cause to make the stop, in light of *United States v. McLemore*, 887 F.3d 861, 863 (8th Cir. 2018). There, the Eighth Circuit held that an officer's inability to read the temporary registration permit from her squad car, without more, did not provide reasonable suspicion to stop the car. *United States v. McLemore*, 887 F.3d 861, 865 (8th Cir. 2018). Given that two other, valid bases for probable cause exist, however, the Court need not find probable cause for the stop on the basis of the expired temporary registration permit.[5]

### B. The Scope of the Traffic Stop

Muhammad next argues that Trooper Leshovsky unnecessarily prolonged and expanded the scope of the traffic stop. During a routine traffic stop, an officer may "conduct an investigation reasonably related in scope to the circumstances that justified the interference in the first place." *Bloomfield*, 40 F.3d at 915 (cleaned up). At minimum, this includes "asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose." *Id.* Trooper Leshovsky acted reasonably in approaching the Camry and asking Muhammad to pull forward so that he could move his squad car out of traffic. Trooper

---

[5] Likewise, the Court need not determine whether probable cause existed based on the observations and investigation by Officer Layton and other members of the VCET team that morning.

Leshovsky acted reasonably in then returning to his car and moving it forward, out of the lane of traffic. Trooper Leshovsky also acted reasonably in approaching the Camry a second time to ask for Muhammad's driver's license and registration. When he did so, he detected a faint odor of marijuana emanating from Muhammad's open window.

At that point, Trooper Leshovsky was justified in expanding the scope of the stop from the original traffic and equipment violations to a possible drug violation. A faint odor of marijuana emanating from a vehicle provides probable cause to search the vehicle for drugs. *United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000); *see also United States v. Smith*, 789 F.3d 923, 929 (8th Cir. 2015) (refusing to distinguish between a faint smell of marijuana and a strong smell of marijuana in determining whether the odor alone justified an automobile search). Even if he did not intend to ticket Muhammad for the traffic and equipment violations, Trooper Leshovsky was "not required to turn a blind eye to new factors that present[ed] themselves in the process of the traffic stop." *United States v. Sparks*, 37 F. App'x 826, 830 (8th Cir. 2002).

Muhammad argues that Trooper Leshovsky's failure to mention the smell of marijuana immediately to Muhammad undermines the credibility of his testimony that he smelled marijuana when he approached the Camry a second time. But Trooper Leshovsky was under no obligation to mention the odor. Furthermore, Trooper Leshovsky testified that he intentionally refrained from mentioning the odor because he did not want Muhammad to feel coerced if he later asked for consent to search the car. The Court finds this explanation reasonable. Moreover, the explanation is consistent with the timing of Trooper Leshovsky's disclosure to Muhammad that he had smelled the

odor of marijuana coming from the car, which occurred just after the trooper asked Muhammad for consent to search the car and Muhammad refused.

Muhammad also argues that Trooper Leshovsky's failure to perform a field sobriety test weighs against his credibility. But Trooper Leshovsky did not testify that he believed Muhammad was impaired, nor was a field sobriety test necessary to find probable cause to search the car for marijuana.

Trooper Leshovsky's next actions—asking Muhammad to exit the Camry, pat-searching Muhammad for weapons at Muhammad's invitation, verifying the registered owner of the car, checking the validity of Muhammad's driver's license and registration, verifying the VIN, and searching the Camry—were all well within the scope of probable cause developed when those actions occurred. Accordingly, the Court recommends that Muhammad's motions to suppress evidence be denied.

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Musalleh Waheed Muhammad's Motion to Suppress Evidence [Doc. No. 88] and Amended Motion to Suppress Evidence [Doc. No. 89] be **DENIED**.

Dated: December 20, 2019            s/ *Hildy Bowbeer*
                                    HILDY BOWBEER
                                    United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in D. Minn. LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.